```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   PAMELA CURLEY, et al.,

 4                 Plaintiffs,

 5            v.                          10 Civ. 5240 (WHP)

 6   ASTELLAS US LLC, et al.,

 7                 Defendants.

 8   ------------------------------x

 9                                        October 14, 2011
                                          12:07 p.m.
10   Before:

11                 HON. WILLIAM H. PAULEY III,

12                                        District Judge

13                          APPEARANCES

14   DICHIARA LAW FIRM, LLC
          Attorneys for Plaintiffs
15   BY:  MICHAEL R. DiCHIARA

16   MORGAN, LEWIS & BOCKIUS, LLP
          Attorneys for Defendants
17   BY:  JOSEPH A. NUCCIO
          RICHARD G. ROSENBLATT
18

19

20

21

22

23

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

1AE5curA                              argument

```
 1             (Case called)

 2             MR. DiCHIARA:  Michael DiChiara, Joseph & Herzfeld.

 3             THE DEPUTY CLERK:  Appearances for the plaintiff.

 4             MR. DiCHIARA:  Good afternoon, your Honor.  Michael

 5   DiChiara on behalf of the plaintiff.

 6             THE COURT:  Good afternoon, Mr. DiChiara.

 7             THE DEPUTY CLERK:  Appearance for the defendant?

 8             MR. ROSENBLATT:  And Richard Rosenblatt and Joseph

 9   Nuccio for defendant.

10             THE COURT:  Good afternoon, Mr. Rosenblatt.

11             MR. ROSENBLATT:  Good afternoon, your Honor.

12             THE COURT:  This is all argument on the plaintiff's

13   motion.  Do you want to be heard?

14             MR. DiCHIARA:  Yes, Judge.  Is it okay if I use the

15   podium, Judge?

16             THE COURT:  Yes.

17             MR. DiCHIARA:  Good afternoon, Judge.  As you know,

18   the standard for 216(b) motion is that the plaintiff just needs

19   to make a modest factual showing and if you put aside

20   everything that plaintiffs have submitted in this case and just

21   rely on defendant's submissions, you have enough to establish

22   that the modest factual showing, that 216(b) notice should

23   issue here.

24             First we have defendant's initial consent to notice

25   going out in the Florida action back in December.  Again, we
```

1AE5curA                          argument

1   have defendant's job descriptions which are similar across

2   therapeutic areas, regions of the country and type of rep.

3   They're all almost essentially identical.  And then you have

4   defendant's declarations which they submitted, I believe it was

5   about 14, where they all --

6          THE COURT:  Does Astellas have a nationwide job

7   description for sales reps?

8          MR. DiCHIARA:  They do, Judge.  I think one of them

9   was submitted as far as the hospital reps that was produced in

10  discovery.  It doesn't indicate that it is limited to

11  geography.  I did submit others that I pulled off of Astellas's

12  website which is identical to the one that was produced in

13  discovery and, again, it is the same job description, it is

14  based on whether it is in Florida or other parts of the country

15  and also based on it is the same based on what type of rep an

16  individual is.  And then, going back to the declarations that

17  were submitted by defendant, I believe there were 14 or 15,

18  they all demonstrate that they have the same primary

19  responsibility of calling on doctors or other health care

20  professionals and conveying Astellas-provided information and

21  they are given target lists to call on and that's significant

22  here.

23         In addition Astellas, as the Ann Allison affidavit

24  indicates which was submitted by defendants, provides that all

25  reps regardless of type of rep -- therapeutic area, business

1   group -- are all classified as exempts.

2          In addition, defendants own incentive compensation,

3   the bonus plan which was submitted with our reply papers, it

4   indicates that the bonuses are the same for all reps, all

5   different types of reps all across the country.  And what is

6   interesting about that plan, your Honor, is that, again,

7   Astellas is claiming these are sales people yet they are

8   eligible for incentive compensation at times when they're not

9   in the field selling, even if they're on maternity leave, FMLA

10  leave and, conversely, they're not eligible for incentive

11  compensation if they happen to be on the performance

12  improvement plan even if they're out in the field selling no

13  matter how robust their numbers will be.

14         THE COURT:  Does the fact that some sales reps earn

15  over $100,000 annually weaken your argument?

16         MR. DiCHIARA:  It doesn't, Judge, because they would

17  have to fit under the highly compensated exemption and to fit

18  under the highly compensated exemption they would have to

19  qualify for one of the two prongs of the administrative

20  exemption, either they have to do work that is generally

21  related to the general business operations or exercise

22  discretion and independent judgment over matters of

23  significance.  Based on the DOL and the Second Circuit's ruling

24  in Novartis, pharmaceutical reps like those here do not

25  exercise discretion in the judgment over matters of

1AE5curA                          argument

1    significance.  And in the Second Circuit's opinion in Reiseck

2    they also do not have a primary duty of engaging in work

3    directly related to the general business operations of

4    Astellas.  And, in fact, there is a Court in the District of

5    Connecticut involving Schering Plough that held just that, that

6    pharmaceutical reps aren't exempt under either prong of the

7    administrative decision.

8          So, we have those rulings here.  The prevailing case

9    law in the circuit indicates that they would not be exempt

10   under the highly compensated exemption.  Also, along those

11   lines, Judge, the FLSA is a broad, medial statute and the

12   purpose behind it was to encourage employers to hire people.

13   So, if you had two people working 60 hours a week the idea was

14   that they would hire three people to work 40 hours a week.

15   And, again, in today's economic climate where people are --

16   where the unemployment rate is high, again that same broad

17   medial purpose would apply today, that if people are working

18   more than in excess of 40 hours it would encourage employers to

19   hire additional people to cut down on their unemployment rate

20   which is one of the indications or one of the reasons for the

21   passage of the FLSA.

22         And then --

23         THE COURT:  What about the defendant's argument that

24   some of the reps sell directly to hospitals?  Does that, in any

25   way, weaken your argument?

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1          MR. DiCHIARA:  Well, I haven't seen any evidence of

2    reps selling directly to hospitals.  The hospital reps of which

3    plaintiff is one, again, they don't talk to health care

4    providers at the hospital and convey information about Astellas

5    products.  And eventually there is other people at Astellas

6    that do negotiate the contracts and the prices with those

7    hospitals.

8          So, I haven't seen any evidence of any rep directly

9    entering into a contract, negotiating a price or anything to

10   that nature and in fact, your Honor, what was submitted as

11   Exhibit E in our reply brief which is the exchange concerning

12   the discovery dispute between the parties, if you refer to page

13   9, again, this is defendant's own words, Astellas does not

14   claim, however, that its pharmaceutical sale representatives

15   collect payments, personally enter into contracts, personally

16   take orders, or personally negotiate prices.

17         So, again -- this is defendant's own words in Exhibit

18   E on page 9.  So, again, there is no evidence that any reps

19   actually sell directly to hospitals meaning that they engage in

20   an exchange of goods, negotiate prices, take orders or

21   negotiate contracts.

22         And, again, even though at this stage we're not

23   supposed to get into the merits I have sort of touched on the

24   merits briefly.  Reps here, it is clear they don't consummate

25   sales, they don't take orders, they don't negotiate contracts,

1AE5curA                          argument

1    they don't negotiate prices, they don't take orders and they

2    engage in targeted promotional work which is not exempt

3    administrative work, and discretion and independent judgment

4    over matters of significance, again, I didn't address it in my

5    briefs and we will address that at the appropriate time.

6              Again, that's just focusing on defendant's submissions

7    and defendant's evidence.  Now, plaintiff's evidence again just

8    confirms that they're misclassified as exempt, they worked more

9    than 40 hours and weren't paid overtime.  It confirms the fact

10   that they don't sell as defined by the DOL and in accordance

11   with the Second Circuit's opinion in Novartis and they don't

12   exercise discretion and independent judgment over matters of

13   significance.

14             Finally, Judge, I just want to bring up the issue of

15   the declarations that were obtained by defendant.  Again, there

16   is no indication that those were properly acquired.  I know

17   defendant submitted a sur-reply indicating, suggesting that

18   they did obtain those properly.  Again, in our mind those raise

19   more questions than answers as far as, you know, the

20   submissions that were set forth in response to --

21             THE COURT:  I think I understand your point and, quite

22   frankly from my perspective, that whole issue is a distraction

23   to the motion that's before me.  So.

24             MR. DiCHIARA:  That's fine, Judge.

25             THE COURT:  Let me hear from your adversary.  All

1    right?

2              MR. DiCHIARA:  Thank you, your Honor.

3              THE COURT:  Thank you, Mr. DiChiara.

4              MR. ROSENBLATT:  Good to see you again today, your

5    Honor.

6              THE COURT:  Yes.

7              MR. ROSENBLATT:  We need to stop meeting like this.

8              I feel like listening to Mr. DiChiara's oral argument

9    which was fine, and his reply brief, our cases are like two

10   ships passing in the night -- although your Honor honed in on

11   one of the cases that has been ignored in the reply brief and

12   ignored in the oral argument and that is this distinction

13   between Novartis-type sales, what I will call CVS sales, the

14   type of prescription that goes and gets filled at the local

15   pharmacy versus what I will call shelf-stocking sales wherein a

16   sales rep goes to the institution and we are going to have some

17   graphic examples of it from the record that apparently he

18   hasn't seen because there is evidence in the record of actual

19   sales to institutions and clinics of products.  These are

20   very -- two very different things.  And it is not to suggest,

21   your Honor -- all I heard here after having been accused in the

22   briefing that all we did was argue the merits.  We're not

23   arguing the merits here today but to your Honor's point there

24   is a difference in the type of sales between somebody who is

25   doing the CVS sale going into a doctor's office and persuading

1    somebody, persuading their customer or the doctor to write a

2    script that's going to get filled at CVS.  We think that that

3    is selling but the point here is that what Mr. Raimundi, the

4    named plaintiff and four out of the five opt-ins did was not

5    script sales.  They were doing shelf-stocking sales and we will

6    show you some highlights.

7         One of the opt-ins, Danielle Feeko from Binghamton,

8    was different from the plaintiff and the other opt-ins.  She

9    did script selling sales.  She sold a urological product to

10   doctors that doctors wrote scripts, they would fill it at the

11   local CVS, her circumstances and the circumstances of many of

12   Astellas's sales reps are different from what you are going to

13   see from the plaintiff and the opt-ins although, frankly, the

14   plaintiff, in our view, is the perfect plaintiff for the

15   defense because he sold a product that was stocked on the

16   shelves, there was no pharmacy intermediary.

17        The other thing that they seem to ignore --

18        THE COURT:  Do some sales reps sell directly to

19   hospitals or pharmacies?

20        MR. ROSENBLATT:  Well, the distinction that

21   Mr. DiChiara is drawing is that, well, they go and sell to the

22   hospitals and they sell to clinics.  There are other people who

23   sell to, for example, wholesalers.  Okay?  In the record I

24   believe there is evidence in the record that at times doctors

25   actually did purchase directly from Astellas.  I think that is

1   changed now and there is a wholesaler that sells but the actual

2   customer relationship between the Astellas sales rep and his

3   customer -- and they refer to them as their customers, the

4   hospital -- is the doctor, the person who runs the pharmacy so

5   that they will then purchase and stock a product on their

6   shelves.  Very, very different from Novartis although we are

7   not arguing summary judgment here, although from listening to

8   plaintiff's oral argument it almost sounds like we are at

9   summary judgment.  The point is different than Novartis,

10  amongst the sales representatives that they purport to be part

11  of the putative class here, very different activities depending

12  on what product you sold.

13      I will point out, your Honor, Judge Cooper in the

14  alternative in the Evancho v. Sanofi case, denied certification

15  in a case that Mr. DiChiara and some others were involved in,

16  denied certification because in that case there was evidence in

17  the record as there is evidence here that there was products

18  that were administered, for example directly in office,

19  injectable products or vaccines.  The most famous injectable

20  product is probably Botox from Pfizer.  Right?  The doctors buy

21  that, stock it in their shelves in the office and have their

22  Botox parties and they administer it.  So, very, very different

23  than what the record reflects in Novartis and I might add, your

24  Honor, in the Martinez v. Forest Pharmaceutical case where you

25  have reps as I understand it who were selling only primary care

1AE5curA                        argument

1    products to doctors in their offices.

2            The other thing that plaintiff's argument and brief

3    ignore, and I'm going to have some examples of it, is that

4    there is a record replete with evidence of dissimilarities

5    between a plaintiff like Raimundi who says he, like the

6    plaintiffs in Novartis, literally were straight-jacketed by

7    their particular manager to comply with regulations.

8            The evidence in the record, that we submitted, is

9    replete with evidence from the plaintiffs, the opt-ins and

10   other people.  That's not our circumstance.  We weren't

11   micromanaged by our supervisor.  We tailored our presentations.

12   And I'm going to highlight some of that but one of the cases

13   that is most interesting to me, your Honor, is Palacios v.

14   Boehringer Ingelheim out of the Southern District of Florida a

15   case that plaintiff cites to you because summary judgment was

16   granted on behalf of Ms. Palacios down there on the findings

17   that she was deemed non-exempt, a pharmaceutical rep case.

18   But, the opinion that plaintiffs don't refer to is the prior

19   one in that case where the Judge there denied 216(b)

20   certification holding, effectively, that although that

21   individual plaintiff might be able to make out her claim, she

22   couldn't stand in the shoes of a putative class because her

23   circumstances were very different than ours, than the class

24   that she purported to represent.  And that decision in Palacios

25   is not unusual.  And frankly, your Honor, we're not asking you

1   to do anything novel here because in Palacios, in Silverman v.

2   Smith Kline Beecham out of the Southern District of California,

3   another case in which Mr. DiChiara 216(b) certification,

4   denied.  Evancho v. Sanofi, denied.

5          THE COURT:  These are obviously outside the Second

6   Circuit and hasn't Second Circuit really said that the

7   threshold is very low at this stage.

8          MR. ROSENBLATT:  No, your Honor.  What the Circuit

9   said in the Hertz case was consistent with the same standard

10  that was applicable to each of those cases.

11         The Hertz case is the exact same standard as in the

12  Third Circuit where Evancho was denied.  It is the same

13  standard in California where the SmithKline case was decided.

14         And, your Honor, the point is it is not a perfunctory

15  standard.  What the Hertz case said, it said even if the

16  standard is of modest evidence it must still be based -- and

17  I'm quoting from Hertz -- it must still be based on some

18  substance and not just unsupported allegations and that's what

19  you have here is unsupported allegations.  It is not a

20  perfunctory rubber stamp which is what plaintiff, by standing

21  up -- he wants you to say it is a perfunctory standard and I

22  don't have to dig any deeper into it but that's not the

23  standard.  He cites the fact that Astellas classifies on a

24  national basis but there are cases, legions of cases saying

25  that's not enough to justify certification.  In fact, your

1   Honor, if that were the standard, every case where there would

2   be -- every misclassification case where there is a challenge

3   to a classification based upon a title like in the Hertz case

4   where station managers were classified on a nationwide basis,

5   same title, same classification, 216(b) certification was

6   denied.  And that's the Hertz case that is supposedly the

7   standard.  Okay?

8          THE COURT:  Hasn't the plaintiff offered other

9   affidavits here and job descriptions in addition to Astellas'

10  common policy?

11         MR. ROSENBLATT:  Yes, and I'm going to deal with the

12  affidavits in a second but let me start with the job

13  descriptions, okay?  Job descriptions, in and of themselves,

14  are not enough to justify 216(b) certification.  Your Honor, in

15  the _Anglada v. Linens & Things_, a case out of the Southern

16  District of New York, "job descriptions and postings do not

17  evince whether prospective employees are in fact similarly

18  situated.  _Diaz v. Electronics Boutique_; despite a common job

19  description, "highly fact specific and detailed analysis of

20  each employee's duties is required making class treatment

21  inappropriate."  In fact, your Honor, if you look at the job

22  description that they're using here, if you look at it, it

23  describes what would be a lawful policy, not an unlawful

24  policy, because if you read that description it shows a

25  position that describes sales and it shows a position that

1    requires strategy.  It is an exempt position and, your Honor,

2    the burden that they carry -- and it is plaintiff's burden,

3    however modest, is to establish that there is a common unlawful

4    policy.  And, Joe, if we can take a look at illustration 1 and,

5    your Honor if you can see this?  It might be a little

6    difficult.  If you refer that I hand you a -- I have copies of

7    it, if you prefer.

8              THE COURT:  I will take a copy.

9              MR. ROSENBLATT:  I apologize, I thought it would show

10   up better.

11             THE COURT:  That's all right.

12             MR. ROSENBLATT:  What plaintiff relies upon are cookie

13   cutter boiler plate declarations --

14             THE COURT:  Let me just ask, which item are we looking

15   at?  No. 1.

16             MR. ROSENBLATT:  Yes, tab 1; and we will try to go in

17   sequence.

18             THE COURT:  Thank you.

19             MR. ROSENBLATT:  And just let me tell you what we have

20   here.  We have pulled from the record and we have done some

21   comparative and contrast in illustrative fashion because I know

22   it is hard to capture that just reading a brief, but the first

23   exhibit, first illustration is a comparison between two of the

24   plaintiff declarations.  What you see here is paragraph 8 from

25   Ryan Nepomuceno's declaration versus that of opt-in Andrea

1   Desaro.  They're virtually identical.  And if you look at all

2   four of the declarations that were submitted, you will see that

3   they are all virtually identical.  It is as if, your Honor,

4   they got Mr. Raimundi to verify the complaint and submitted

5   that.  And we do know under the Hertz case that mere

6   allegations are not enough.  That's what these are.  These are

7   mere allegations.  This isn't substance.

8          And what the Court said in Silverman v. SmithKline --

9   and it is very particularly relevant here, it is the same

10  playbook that plaintiff used in that case they're using here.

11  Plaintiff presented, "narrow, potentially unrepresentative

12  samples in support of a broad conclusion.  The Court strongly

13  disapproves of the use of boiler plate attorney-drafted

14  declarations."  That's at 2007 U.S. Lexis 80030 at page 5.

15  That's exactly what's been done here.

16          It is interesting, your Honor, I think you would find

17  it highly interesting that you allowed us to create a discovery

18  record here and we took depositions of plaintiff and every

19  opt-in except for one and there is probably at least 1,000

20  pages of deposition testimony and plaintiff filed two briefs,

21  did not cite a single page of the plaintiff or the opt-ins'

22  deposition testimony.  And let's explain why that is.

23          If we can take a look at illustration no. 2, the top

24  call out, your Honor, is paragraph 11 of Mr. Nepomuceno's

25  declaration.  He says that he was provided this list of doctors

1   and was instructed how many times he had to visit the doctors.

2           Well, I deposed Mr. Nepomuceno and starting at page

3   122, line 24 of his deposition transcript I asked him:

4   "Q  Did they" -- in reference to Astellas -- "tell you the

5   particular surgeons to call on?

6   "A  No.

7   "Q  And the surgeons were not on your list, right?

8   "A  No."

9           And then you can read for yourself, your Honor, I

10  said:

11  "Q  How did you find out who they were?

12  "A  By going to the hospital."

13          That's very different than the conclusionary

14  allegation in the boilerplate employer created declaration that

15  he signed.

16          If we turn to the issue of outside sales you will see

17  that there is a mantra throughout the declarations and if we

18  look at illustration No. 3 Plaintiff Raimundi, and I believe

19  every one of the declarants for the plaintiff said I acted as

20  an educator of physicians for Astellas.  My goal was just to

21  keep Astellas products in the minds of doctors.  They're trying

22  to suggest to your Honor that they're not really like sales

23  persons, they don't have the indicia of sales.  If you

24  remember, your Honor, from the New York Life litigation about

25  the indicia of sales, we got very deeply into that.

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1AE5curA                              argument

1          Now, if you take a look at the callout below that,

2    Danielle Feeko, who is an opt-in participating in this case, I

3    asked her at her deposition, and this starting at page 49, line

4    25:

5    "Q  And so, am I correct that in performing your job

6    responsibility your objective was to persuade doctors to write

7    prescriptions?"

8          She asked me to repeat and she asked me to define how

9    to persuade -- what I mean by persuade doctors.  The final

10   question:

11   "Q  Get them to write prescriptions for Vesicare.

12   "A  Yes."

13         She wasn't describing herself as a mere educator.  And

14   I'm not suggesting, your Honor, that Mr. Raimundi or the other

15   declarants weren't telling anything other than the truth.  They

16   may have viewed their jobs as mere education.  They may have

17   had managers who said just go out and educate.  But, that's not

18   what their fellow opt-in Danielle Feeko said.

19         If you turn to illustration no. 4, your Honor --

20         THE COURT:  Let me ask that in the end, aren't all the

21   reps responsible for meeting with physicians, distributing

22   marketing materials that somebody has reviewed, organizing

23   calls and getting commitments to purchase Astellas's products?

24         MR. ROSENBLATT:  Your Honor, what I would say is in

25   every misclassification case there are going to be certain

1   common attributes but that doesn't resolve the issue as to

2   whether the particular individual plaintiff or opt-ins should

3   stand in the shoes and represent a class of more than a

4   thousand people around the country.  The same could have been

5   said for the four cases where certification was denied.  In the

6   Palacios v. Boehringer Ingelheim case, which relied upon

7   Novartis to grant summary judgment, that Judge said 216(b)

8   doesn't apply.

9           If you look at the Hertz case, your Honor, if you read

10  the case about the station managers there, you bet every one of

11  those station managers, all throughout the country, would have

12  certain things that they do in common including have the same

13  job title but that doesn't resolve the issue as to whether

14  they're so similarly situated as to be able to represent

15  everybody else who happens to have the same job title.

16          In fact, your Honor --

17          THE COURT:  But can't you challenge those things at a

18  later time after preliminary certification?

19          MR. ROSENBLATT:  Sure I can, your Honor, but you

20  allowed us to create a record.  This is not a case like some of

21  the cases that plaintiff cited where they're at a very, very

22  early stage with a barren record.  It is not as if we -- I

23  didn't want to repeat my brief, but in our brief we pointed out

24  that this is not some inconsequential exercise to send out a

25  notice to all of your current employees and many of your former

1AE5curA                           argument

1    employees and say you can go sue your employer.  This is

2    something, your decision has consequences, your Honor, and you

3    need to be cognizant of those consequences because that is,

4    first of all it is a labor-intensive task but it is also

5    something that puts us in a bad spot with our employees.  And

6    so, that is not -- the fact that we could try to undo it later

7    and perhaps send out a notice and say, okay, my bad, they

8    shouldn't have certified in the first place; that creates

9    confusion on the part of these absent class members as well.

10   You allowed us to create a record, we created that record, we

11   would ask that you consider that record in determining whether

12   the plaintiff has carried his burden.  This isn't our burden to

13   disprove, it is their burden.

14         And, your Honor, on the issue of -- I will skip over

15   it to move things along, I know you have other business today,

16   but on the issue of what their job responsibilities are, that

17   doesn't begin to address the issue of discretion and judgment

18   of which there is wide variety of stories being told here.

19         Your Honor, we have already made the point but before

20   I get to the administrative exemption --

21         THE COURT:  If their responsibilities differ so widely

22   why does Astellas uniformly classify them as exempt?

23         MR. ROSENBLATT:  I said that certainly the discretion

24   in judgment that they purport to have differs widely.  You know

25   the ultimate goal is to sell product, okay?  So they have these

1AE5curA                      argument

1   common attributes and note, just like most employers with the

2   nationwide sales force or nationwide job -- a company with

3   nationwide people doing things that are similar in nature, they

4   have a common total.  And it is very common to use a common job

5   description.  I have cited to you some cases and there is more

6   in the brief, that is by no means sufficient basis to conclude

7   that there is similarly situatedness for the purpose of 216(b).

8   Again, I go back to the Hertz case.  That could apply there as

9   well, your Honor, and 216(b) certification could have applied

10  in the Amendola v. BMS case right here -- Amendola v. Bristol

11  Myers Squibb, Judge Cote.

12          THE COURT:  A pharma rep case.

13          MR. ROSENBLATT:  I know we are pressed for time so I

14  will try to accelerate but I will try to slow down.

15          Your Honor, just to capture the point on the

16  distinction of the type of products that people sell, just for

17  the record we have a product called Adenoscan, a product called

18  Lexiscan; those are stress agents that are sold to doctor's

19  offices, clinics, to use in stress tests not filled at a

20  pharmacy and a number of other products:  Mycamine, Vibativ,

21  Vaprisol, Amevive, all are products that are shelf-stocking

22  products.

23          But I want to cut to the chase on the administrative

24  exemption, your Honor.  We have provided 14 declarations that

25  are not boilerplate declarations, they describe a variety of

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1  different ways that people do their business.  They describe a

2  variety of different relationships with supervision with their

3  supervisors where some of the plaintiffs and opt-ins claim they

4  were micromanaged.  The other declarants say quite unlike those

5  other opt-ins and quite unlike Novartis we were not

6  straight-jacketed at all.

7        But even if you were not to look at those

8  declarations, your Honor, you look at the plaintiffs' evidence

9  or evidence that we garnered from the plaintiffs, put aside

10  their declarations, you will see, one, that the evidence that

11  they presented is not competent to speak for others.  What

12  they've tried to do, and this is a typical play in these pharma

13  rep cases, is to get the small group of people that they have

14  to say that they have the ability to speak for everybody else

15  and occasionally a Court will say that's good enough for me.

16  There is plenty of other Courts that have said you are not

17  competent to speak for, and New York can't speak for somebody

18  in New Jersey or even somebody in California.  And let's

19  explain why.

20        Joe, can you bring up illustration 6 or just turn to

21  illustration 6 at this point?  We will see in this example of

22  why the plaintiff's evidence is incompetent to reflect the

23  situations of others.

24        Plaintiff Desaro testified that her goal, as with

25  every other plaintiff, was to educate, not to sell.  And then

1AE5curA                              argument

1   she concludes by saying based upon my observations and

2   interactions with other reps, I believe this was the same for

3   all reps.

4         Now, your Honor, if you turn to her deposition

5   testimony, before she had the benefit of having someone write a

6   declaration for her she had to testify under oath and I asked

7   her a question that related to whether any of her colleagues at

8   Astellas asked any doctors to switch from a competitor's

9   product to an Astellas product and her answer, I wish I had the

10  video here, somewhat flippant, was no clue.  I don't work with

11  those people.  I'm not in their bodies.  And, witness after

12  witness testified that they only knew their own circumstances,

13  your Honor.

14        Another example why they don't cite their deposition

15  testimony, they cite their declarations.  Another example of

16  that is illustration no. 7, your Honor.  There is a

17  particularly important one, this is Ms. Desaro again, in the

18  callout from paragraph 11 of her declaration she says:

19  Defendants instructed me on what products I should talk to the

20  physicians about, what message or information to provide to the

21  doctors and the order that I should present.  The message,

22  again, theme being I had a straightjacket like the Novartis

23  people.

24        Now, in her deposition testimony on page 229 starting

25  at line 13 she said, in answer to a question:  It is hard to

1AE5curA                             argument

1    maintain a standard formula when each situation is very

2    different and it doesn't mean anything anyway.

3         I followed up and said:

4    "Q  So, the question, the approach to use in each sales call

5    will vary based on the circumstances of the sales call?

6    "A  Yeah.  That's what I said."

7         Something like that tone, your Honor.  So, the

8    declarations and the testimony don't line up and it doesn't

9    line up when you look at the issue of supervision.  So, if you

10   look at illustration no. 8, your Honor Plaintiff Raimundi, who

11   is our first deponent when we created this record in the

12   callout from his deposition testimony starting, it is on page

13   66, line 13, was testifying about his claim that at times his

14   manager demanded that he script out questions that he was going

15   to ask doctors and get the manager's approval to ask those

16   questions of his customers the doctors.  That was

17   Mr. Raimundi's story.  The callout below is from

18   Mr. Nepomuceno's deposition also page 66, line 13 of his

19   coincidentally, actually:

20   "Q  Did you ever prepare written questions that you were going

21   to use?

22   "A  No.

23   "Q  And you never provided written questions to Buffy for her

24   approval?"

25        Buffy was his manager.  And the answer was

1AE5curA                            argument

1    "A   No."

2              And I will tell you that I asked that same question to

3    every one of the deponents and each one of them acknowledged

4    that they were very different than Mr. Raimundi.  I'm not

5    suggesting that Mr. Raimundi isn't telling the truth.  That may

6    have been his circumstance but it's not similar to the

7    circumstance of the people -- of other opt-ins and is certainly

8    not similar to the circumstance of absent class members.  And I

9    will wrap up with a few quick illustrations, your Honor, to

10   bear that point out.

11             If you look at illustration no. 9, again, this is from

12   Raimundi, your named plaintiff's declaration, he says every

13   piece of printed or written material that I utilized or

14   provided to doctors was pre-approved and supplied by Astellas

15   and I was also trained on how to present these materials and

16   given scripted messages about the Astellas product.  That

17   declaration is intended to tell you, your Honor, that I'm

18   scripted, I'm like the Novartis people even though the fact I'm

19   selling other products that are bought at clinics that I'm like

20   the Novartis people with a straightjacket around me.

21             If you look at the callout from illustration no. 9,

22   paragraph 7 is from the declaration of Todd Black, one of the

23   non-opt ins that plaintiffs purport to want to represent.  He

24   starts off by saying:  I also tailor my sales calls based upon

25   the customer's individual interests.  And he goes on to

1AE5curA                          argument

1    describe how he, in detail, not like cookie cutter boilerplate

2    stuff, he describes in detail how he tailored his sales calls.

3    He says at the end while Astellas provides me with a variety of

4    sales aids that I can use during my calls, it is up to me to

5    learn where each customer's interest lies and then present and

6    discuss particular sales aids to appropriately address those

7    interests.

8            That's someone who is making judgments, that's

9    somebody who is developing strategy, that's someone who is

10   running a business, running a territory.  That's not the

11   cookie -- that's not the straight jacketed sales rep in

12   Novartis, that's not Mr. Raimundi your named plaintiff.  A very

13   different set of circumstances if we accept both of them as

14   true as I'm prepared to do.

15           Then, your Honor, if you look at no. 10, Mr. Raimundi

16   saying, again, he is stuck with the list that Astellas

17   provides, that's paragraph 12 of his declaration and he says

18   he's told how many times to call on his customers.  Declarant

19   Donald Drake attested that the frequency goal refers to a

20   suggested minimum number of times a representative calls on a

21   provider in each court.  And you will see at the end of the

22   call, I will short circuit it, I do not need to seek approval

23   from my regional sales manager to make any of these changes.

24   Maybe Mr. Raimundi was micromanaged, I don't know, but that's

25   not something he can say for everybody else.

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1          Finally, your Honor, illustration 11, this is again

2     Mr. Raimundi's declaration, strictly controlled by Astellas is

3     what he says.  This is an excerpt from Danielle Feeko, again an

4     opt-in who filed a consent form in this case and you will

5     notice, your Honor, there is no declaration submitted from

6     Danielle Feeko submitted in this case because she couldn't

7     possibly justify or reconcile a declaration that's akin to the

8     boilerplate we have seen with her testimony.

9          I asked her:

10    "Q  You developed a strategy for the particular sales call,

11    right?

12    "A  Yes.  So she's acknowledging that she's not scripted, she's

13    developing a strategy."

14          And if you go on she talks a little bit further, I

15    say:

16    "Q  And so, you'd have that strategy and am I fairly safe to

17    say probably nine times out of ten you'd show up at a doctor's

18    office and, you know, you'd have to change directions and do

19    something different?

20    "A  All the time."

21          That's in the script, your Honor.  That's different

22    than Raimundi.  Feeko in Binghamton, Raimundi here in

23    Manhattan; different circumstances, different managers,

24    different behaviors.  The dissimilarities, your Honor, abound.

25    You have identified in your first question to Mr. DiChiara the

1    fact that people are selling a product, in fact your Honor just

2    to highlight that point, if we can go back to no. 5, Joe, this

3    one captures your question to Mr. DiChiara and his answer that

4    he's not aware of any direct sales.  Paragraph 21 is this

5    theme -- paragraph 21 of Mr. Raimundi's declaration is the

6    theme of plaintiffs that they don't transfer title therefore

7    they can't sell.

8            Now, if we look at the testimony of Mr. Raimundi and

9    his deposition is replete with examples like this, I'm asking

10   him about what he did to convert Bronx Bridge Nuclear which is

11   a clinic that does stress tests; convert meaning that switching

12   from a competitor's product to Astellas.  Sounds like sales to

13   me, your Honor.  And here's his answer:  They were, in

14   reference to Bronx Bridge Nuclear, they were Adenoscan

15   customers.  They purchased Adenoscan from us and they were a

16   target for Lexiscan as well.  Lexiscan was the next generation.

17           That sure sounds like selling, your Honor.  They

18   purchased from Astellas.  That's what people were thinking --

19   that's what Raimundi thought when he was doing his job.

20           And so, I conclude and I summed up for him:

21   "Q  So you were trying to get Bronx Bridge Nuclear to buy

22   Lexiscan, right?

23   "A  Correct."

24           Hard to reconcile with his claim that he is a mere

25   educator.  It is certainly hard to reconcile with the facts in

1AE5curA                          argument

1    Novartis and Martinez v. Forest Pharmaceuticals.

2           So, the dissimilarities abound with regard to sales

3    and the products that people sold, whether they're educators or

4    salespeople, whether they were heavily supervised by district

5    managers or not, whether they had flexibility during sales

6    calls, whether they used scripted questions or not.  In our

7    papers we laid out song and verse.  We cataloged those types of

8    dissimilarities for your Honor and we hoped what we wanted to

9    do here was try to capture some key points to draw it out for

10   you.

11          Your Honor, you have discretion here to deny

12   certification.  You have discretion to look at whether the

13   plaintiff carried his burden of proving that he is so similarly

14   situated in a work force that is across an entire nation that

15   notice should go to all of our employees and that he could be

16   their representative.

17          If we bring up illustration 12, this one you can

18   probably see a little better although the map in your book

19   highlights what we are trying to point out.  Illustration 12

20   shows that you have got four declarants on behalf of plaintiff

21   and if you see, two of them are in Jersey and two of them are

22   in New York, basically on both sides of the George Washington

23   bridge.  And what is interesting is you see the name Frank

24   Curcio between the two upper red boxes, your Honor?  Frank

25   Curcio is a declarant for whom we submitted a declaration who

1    said: *I'm a sales guy.  I have discretion and judgment.*  And,

2    guess what?  Mr. Curcio reported to the same manager as

3    Mr. Raimundi.  And Mr. Raimundi wants to say he can represent

4    the circumstances of Mr. Curcio.

5         But you look at this map, your Honor, you've got

6    people in basically, I don't know, maybe a 10 mile radius, you

7    have four of them purporting to represent a class that is

8    nationwide and we have presented to you declarations from all

9    over the country of people who are saying they're very

10   different than Raimundi.

11        And, your Honor, not only does the record that's been

12   created -- they directed and authorized us to create -- stand

13   in the way of a conclusion that these folks are similarly

14   situated, I would suggest to you that it would be unfair in

15   this case to certify a collective action and if we can go back

16   to the very beginning of this case let's discuss why that is.

17        If your Honor will recall, we initially filed a

18   pre-motion letter seeking to either dismiss this case or

19   transfer it back to New Jersey because the original name on the

20   caption of this case was Pamela Curley.  And if your Honor will

21   recall, Pamela Curley was employed by Astellas in New Jersey

22   and she had sued Astellas in New Jersey represented by

23   Mr. DiChiara bringing claims under New Jersey employment law.

24   By definition, therefore, she must have considered herself, at

25   least in some measure, a New Jersey employee if she was trying

1     to avail herself of New Jersey employment law.

2              We said to your Honor this case either should be

3     dismissed or transferred over to New Jersey, and if it had been

4     transferred over to New Jersey we would be governed by Third

5     Circuit law, Smith v. Johnson & Johnson, which held that the

6     sales representatives of Johnson & Johnson were exempt

7     ex-employees.

8              So, plaintiff didn't want to get stuck in New Jersey

9     so Ms. Curley got dropped like a hot potato because the

10    plaintiff's counsel was fortunate enough to find a sales

11    representative who happened to live in New York and that's

12    Jesus Raimundi.  And by virtue of that happenstance he now

13    wants to send out a notice and have a nationwide collective

14    action governed by Second Circuit law because he loves

15    Novartis.  Even though, as I have said, Novartis is

16    distinguishable from the facts of our case, who wouldn't want

17    to be in the Second Circuit where you have got Novartis?  He

18    certainly doesn't want to be in the Third Circuit.  He

19    certainly doesn't want to be where Dave Anderson of California

20    is.

21             THE COURT:  Isn't that sort of just a fact of life

22    because we have different circuits?

23             MR. ROSENBLATT:  No, your Honor.  It doesn't have to

24    be a fact of life, okay, because, your Honor, you have

25    discretion.  We have a circumstance here of a federal law

1   that's supposed to be uniform.  Okay?  And you've got circuit

2   courts that have conflicting conclusions here.

3           THE COURT:  But the Second Circuit grades my papers.

4           MR. ROSENBLATT:  Understood, but we're not asking you

5   to decide the merits here, your Honor.  You have discretion to

6   decide whether it's appropriate and fair to certify this case

7   here in the Southern District of New York.  And, as I said in

8   the Palacios case, you had a judge there that thought Novartis

9   was spot on -- we disagree -- but held that it was spot on and

10  granted summary judgment for an individual plaintiff saying you

11  were misclassified as non-exempt.  But, I'm not availing your

12  claim to represent that of everybody else.  It simply is unfair

13  to Astellas, with a nationwide workforce, in a situation where

14  you are supposed to have a body of uniform law to say that all

15  of its employees are going to be governed by right now is a

16  single decision out of one court holding that the plaintiffs in

17  Novartis were not exempt.  You don't need to tell Astellas that

18  you basically have to reclassify everybody because he happened

19  to find a single plaintiff in New York that he could substitute

20  conveniently in for the New Jersey-based plaintiff.  You don't

21  have to do it, it would be unfair, but you don't even need to

22  reach the fairness issue, your Honor.  Even though it wasn't

23  our burden of proving a lap of similar situatedness plaintiff's

24  burden to prove similarly situatedness, the record that we have

25  presented, some of which we highlighted here but all of which

1AE5curA                          argument

1    is obtained and attached to our opposition papers establishes

2    not only has the plaintiff failed to establish similarly

3    situatedness, but the record that you directed and allowed us

4    to create is that they aren't similarly situated.  They're not

5    similar to Novartis.  The opt-ins of the plaintiff are not

6    similarly situated amongst themselves and they're similarly not

7    situated to the people who are peppered around the country who

8    have very different stories, very different circumstances than

9    Mr. Raimundi.

10            THE COURT:  I think I understand your arguments.

11   Thank you, counsel.

12            Mr. DiChiara, do you want to be heard further?

13            MR. DiCHIARA:  Yes.  Just a few points.

14            THE COURT:  All right.

15            MR. DiCHIARA:  Your Honor, is it okay if I stand here

16   or would you prefer the podium?

17            THE COURT:  I would prefer the podium.

18            MR. DiCHIARA:  That's fine.

19            Judge, for being criticized for making some

20   merits-based arguments I heard a lot of merits-based arguments

21   from defendants but, again, I still did not see or hear

22   anything indicating that these plaintiffs sell anything.

23   Again, it's probably a gross distortion of the record, citing

24   to Exhibit 5 from Mr. Raimundi, where he is saying that they

25   purchased the Adenoscan from us when even Mr. Rosenblatt

1AE5curA                          argument

1    indicated that that was Astellas, not him.  Again, there is

2    nothing indicating, again, as Novartis set forth as far as what

3    the standard is for making sales, again, there is nothing in

4    the record from these plaintiffs that they sold anything,

5    negotiated contracts, took orders, signed anything, engaged in

6    any exchange of goods.  And, again, there is some reference to

7    a case in New Jersey about injectables and vaccines.  There is

8    no injectables or vaccines at issue here, Judge.

9         Again, the whole purpose of 216(b) is there is the

10   modest factual showing, which plaintiff has more than

11   satisfied.  Again, if the defendants believe that there is a

12   difference, they have the opportunity to decertify the class.

13        THE COURT:  Your affidavits are from New York

14   metropolitan area employees.  How do you know that the job of

15   sales representative doesn't differ in other states?

16        MR. DiCHIARA:  I know that for a number of reasons,

17   Judge.  I know that from job descriptions that have been

18   submitted by defendant.  I know it from the declarations

19   submitted by defendants from all parts of the country as you

20   can see on the exhibit that's on the screen there.

21        Again, the defendant gets into some minutia as to

22   whether they were micromanaged or not.  It doesn't matter.

23   Their core responsibility was the same, was to call on

24   physicians or health care providers and provide information

25   about Astellas products.  That's how I know it.  Defendant

1AE5curA                         argument

1    provided that evidence in the form of job descriptions and in

2    the declarations they submitted.

3              Again, if you look at the declarations they're

4    basically the same.  They may have, you know, phrases that

5    might be slightly different but, again, they're describing the

6    same thing calling on doctors, providing information, doing

7    some planning, undergoing training, everything that every

8    single rep at Astellas does.  So, again, that satisfies that

9    they're similarly situated.

10             Again, there is some reference to the Amendola case

11   which has been not followed by any other Court in this Circuit,

12   in fact it is being criticized as applying a Rule 23 standard

13   and getting to the merits.  Again, if defendants really believe

14   there is a distinction between these reps, they can do that at

15   a later point when there is summary judgment or move to

16   decertify the class.  At this point the plaintiffs have more

17   than satisfied the modest factual showing that that is required

18   at this stage.

19             THE COURT:  Counsel, thank you for your arguments.

20             Decision reserved.

21             The Court appreciates the briefs that were submitted

22   in this case on the motion.  They were thoughtful and readable.

23             MR. ROSENBLATT:  I was worried after the first

24   argument I heard.

25             THE COURT:  Have a great weekend.
                                o0o